Filed 03/16/26

VERMONT SUPERIOR COURT

Rutland Unit
83 Center St
Rutland VT 05701
802-775-4394
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 24-CV-00146

---

Timothy Johnson et al v. Jeremy Sullivan

---

## DECISION AND ORDER ON
## DEFENDANT'S MOTION FOR RECOVERY OF
## COSTS AND EXPENSES CAUSED BY MISTRIAL

Defendant Jeremy Sullivan, moves for an order awarding him costs and expenses, including attorneys' fees, he incurred in connection with the mistrial in this matter. Plaintiffs oppose Defendant's requested attorneys' fees as unreasonable and/or lacking support. Plaintiffs also request a stay of enforcement of any sanctions until the case is adjudicated on the merits. Alternatively, they request that this sanction decision be immediately entered as a final judgment pursuant to Rule 54(b).

Plaintiffs are represented by Kevin A. Lumpkin, Esq. Defendant is represented by Antonin I.Z. Robbason, Esq., Katharine Alvarez-Rios, Esq., and Mark F. Werle, Esq. For reasons that follow, the Court GRANTS IN PART, and DENIES IN PART Defendant's motion for sanctions.

### Background

This matter involves competing claims for breach of contract and bad faith conduct. On November 19, 2025, during the third day of a jury trial in this action, the Court granted Defendant's oral motion for mistrial. Prior to the mistrial being declared, Mr. Johnson was testifying under cross-examination. Defendant's lead counsel, Attorney Robbason, was questioning Mr. Johnson regarding the decision to move himself and his family away from their longstanding residence in the town of Barnard. It appeared that Attorney Robbason sought to elicit an admission from Mr. Johnson that the decision to move across the state (to Rutland County) was driven by factors or reasons other than those he previously testified to. Mr. Johnson became visibly frustrated under this line of questioning. In response to a question, Mr. Johnson suggested to Attorney Robbason that he read to the jury (or perhaps, allow the jury to read for itself) a news article that had reported statements made by Mr. Johnson during a contentious town meeting in Barnard. Without any question pending or prompting from Attorney Robbason, Mr. Johnson stated: "While you're at it, read Mr. Sullivan's article as to why he's not a State Trooper anymore."

Following Mr. Johnson's statement, the jury was excused from the courtroom. Following a brief conversation with the parties, the court took a recess. Following the recess, the court

called the parties back into the courtroom. At that time, Defendant's counsel moved for a mistrial and for sanctions, requesting that the Court order Plaintiffs to reimburse Defendant for the trial-related costs and expenses incurred by Defendant, including attorneys' fees. Plaintiffs' counsel opposed the mistrial arguing that mistrials for prejudicial testimony are generally granted only where the testimony is made in violation of an existing court order that specifically barred such testimony. In response to questioning from the Court, Attorney Lumpkin explained that he and Attorney Robbason had a pre-trial agreement between themselves, that the parties would not seek to elicit testimony or any evidence regarding Mr. Sullivan's prior employment with the State Police. Attorney Lumpkin explained that he had discussed the agreement with his clients and discussed the "bounds" of their testimony. Attorney Lumpkin stated that he had not reminded his clients of the agreement prior to that morning's anticipated testimony. Attorney Lumpkin further suggested an explanation for what had happened, to wit: that as Mr. Johnson became "more and more heated" under cross-examination, his answers had become more "unhinged," and in an apparent act of "anger," Mr. Johnson's statement about Mr. Sullivan having lost his job with the State Police "slipped out."

In declaring the mistrial, the Court reasoned that while there was no court order specifically barring Plaintiffs' testimony about Mr. Sullivan's employment history, due to the parties' reliance on their agreement. Given those circumstances, a preliminary court order was never sought by Defendant, and therefore never granted. The Court also found that Mr. Johnson's statement had caused substantial prejudice, because the jurors would be left to wonder what sort of conduct caused Mr. Sullivan to lose his position as a State Trooper. The Court found that particularly concerning, since one of Plaintiffs' principal claims alleged that Mr. Sullivan purposefully engaged in unfair and/or bad faith conduct. The Court concluded that the prejudice to Defendant arising from Mr. Johnson's statement could not be cured through a curative instruction and thus declared a mistrial. Upon Attorney's Lumpkin's request for briefing on the sanctions motion, Court indicated that it would decide the motion following briefing, and any further hearings as appropriate.

Following the Court's ruling, on November 26, 2025, the parties filed a "Joint Stipulation on Handling the Attorney Fee Request and to Allow Plaintiff to Review Attorney's Fees and File Disagreements." The stipulation stated "[t]he parties agree, after review of the applicable law, that an award of attorney's fees is appropriate under the circumstances and wish to avoid spending item on briefing that question." See Stipulation filed November 26, 2025.

Eventually an evidentiary hearing was held on the issue of attorneys' fees. Notably, Defendant's initial memoranda and supporting affidavit sought full recovery of fees incurred by his attorneys for purposes of preparing for the trial. Defendant also sought, for example, recovery of all fees incurred in opposing Plaintiff's pre-trial motions in limine, and fees incurred for purposes of preparing proposed jury instructions for the Court. However, just prior to the hearing, Defendant substantially revised his position on these issues. Defendant filed a new exhibit in anticipation of the hearing, entitled "Comments and Opinions of Rodney McPhee," which substantially reduced Defendant's claim for fees in several respects, including for trial preparation and other pre-trial work.

At the hearing, held on January 13, 2026, Defendant's exhibits were admitted by stipulation, and three witnesses testified for Defendant: Attorney Robbason, Attorney Alvarez-Rios (a junior associate at Mr. Robbason's law firm who attended the trial), and Rodney McPhee, an experienced civil litigator and managing litigation partner at a Rutland law firm. Mr. McPhee was found qualified and allowed to offer expert opinion testimony on the issue of reasonableness of fees and costs incurred and claimed by Defendant. Mr. McPhee offered an opinion on the amount of first-trial-related preparation performed by Defendant's attorneys that would be usable or beneficial to a second trial (and therefore, not recoverable). Plaintiffs did not present any evidence of their own, but cross-examined Defendant's witnesses in an effort to demonstrate weaknesses in their positions and conclusions on various issues. At the conclusion of the hearing, the parties each presented oral argument on various issues.

Analysis

The parties agree on several issues, and for the purpose of clarity, the Court will recite them here at the outset.

Plaintiffs do not dispute the Court's inherent authority to sanction Plaintiffs by ordering them to pay the reasonable costs and expenses incurred by Defendant in connection with the mistrial caused by Mr. Johnson's misconduct. The parties also agree that the sanction must be compensatory merely—to make Defendant whole, without imposing a punishment or non-compensatory fine. Plaintiffs do not dispute the hourly rates charged by Defendant's attorneys. There is no disagreement that the amount of time billed by Defendant's attorneys for legal work was appropriate. More specifically, Plaintiffs do not dispute, for example, the $2,123.81, in "hard costs" incurred by Defendant for the first trial. Plaintiffs also do not dispute the $2,135 incurred by Defendant's counsel related to the jury selection process. They also do not dispute the $9,275.00 in legal fees incurred by Defendant for his lead attorney's participation in the 2-plus days of the trial.

Plaintiffs challenge the extent of Defendant's requested recovery of attorneys' fees in two primary respects. First, they argue that Defendant's attorneys' trial preparation should be discounted because it reduces the amount of preparation needed for a second trial. Plaintiffs argue only 25% of those claimed attorneys' fees should be recoverable, with the remainder disallowed. Relatedly, Plaintiffs argue that Defendant failed to adduce sufficient evidence to support his position that he should recover half of the fees incurred as a result of his attorneys' first-trial-related preparation work. Second, Plaintiffs argue that Attorney Alvarez-Rios is a junior associate who did not appear to actively participate during the trial, and her attendance at trial was not necessary and that she likely appeared for educational or training purposes, thus those fees should be non-recoverable. The Court addresses these two challenges in turn, before reaching questions related to the enforcement of this order.

I.  Plaintiffs' Request to Reduce Recovery of Trial Preparation Fees By Seventy-Five Percent.

Plaintiffs seek a 75% reduction of the fees incurred by Defendant's related to attorneys' fees for trial preparation on the theory that the bulk of such trial preparation work will not have to be repeated for a second trial. The Court does not agree.

It bears repeating that as a matter of causation, Plaintiffs are solely responsible for the mistrial. As such, Plaintiffs—and particularly, Mr. Johnson—caused trial preparation fees that were reasonably incurred by Defendant to go to waste. Indeed, Mr. Johnson's conduct cost Defendant the opportunity to obtain a jury verdict, which presumably would have obviated the need for any second trial. *See In re Gould*, 77 F. App'x 155, 163-64 (4th Cir. 2003) (per curiam; unpub.) ("The effect of the mistrial . . . was to end the trial prematurely, leaving both [parties] without resolution of the underlying claim."). Defendant is no closer today to a final resolution of this case on the merits than he was before his attorney began preparing for the first trial. It is hard to see how he comes out "ahead" by an order compensating him for all trial preparation fees that he incurred but which were wasted and lost, through no fault of his own.

Moreover, there are no reasonable grounds that justify reducing Defendant's recovery of fees reasonably incurred by him for the first trial simply due to the likelihood of a second trial. Defendant is entitled to "consequential damages suffered" due to the opposing side's misconduct, *Turner v. Roman Catholic Diocese of Burlington, Vt.*, 2009 VT 101, ¶ 16, 186 Vt. 396, and the mistrial did not cause a second trial, in any sense of legal or actual causation. After all, the second trial has not even taken place, and the parties could settle tomorrow, avoiding a second trial altogether.[1] Because the second trial is not certain, it cannot serve as a basis for reducing a fee award today. This Court sees no merit to the notion that Defendant should be compelled to essentially bear the risk of unforeseen events.

Plaintiffs' position on this issue rests on a single, unreported federal district court decision, *Bat v. A.G. Edwards & Sons, Inc.*, Civil Case No. 04–cv–02225–REB–BNB, 2007 WL 2320539 (D. Colo. Aug. 9, 2007). There, in deciding the question of trial-related costs and fees that were permanently lost due to a mistrial caused by the plaintiff's attorney, the court reasoned that "[d]efense counsel's trial preparation time was not lost in this relevant sense, since the work done during that time will continue to be germane to any retrial of this matter." *Id.* at *3. The court thus summarily disallowed *all* first-trial preparation fees incurred by defendant, the party not at fault for the mistrial. This Court notes that at least one other federal district court, also in an unreported decision, reached the contrary conclusion. *See Ferguson v. Valero Energy Corp.*, Civil Action No. 06-540, 2010 WL 2164493, at *8 (E.D. Pa. May 27, 2010) (awarding request for all attorneys' fees, costs, and expenses incurred for purposes of a first trial that ended in a mistrial because "all the expenses of the first attempt to hold a trial have been wasted").

Of more significance is the U.S. Court of Appeals for the Second Circuit's opinion in *Gierlinger v. Gleason*, 160 F.3d 858 (2d Cir. 1998). In that Title VII case, there were three trials. The first trial resulted in a partially favorable verdict for the plaintiff, which was reversed on appeal. The second trial, held two years later, resulted in a mistrial, though not attributable to

_____

[1] It is fair to presume that the first trial was likewise not essential or necessary. However, once that trial began, or perhaps once Defendant's counsel began reasonably preparing for that first trial, the fees incurred for that preparation work were no longer reasonably avoidable and were no longer unnecessary or speculative.

the conduct of any litigant or attorney. After the third trial yielded a favorable verdict for plaintiff, she sought recovery of attorney's fees that she incurred in preparing for the second and third trials. The trial court declined to award attorneys' fees for preparation time for the second and third trials, reasoning that "'[i]n light of the plaintiff's attorney's familiarity with the case, such are redundant and excessive.'" *Id.* at 878 (quoting post-trial order). The Second Circuit was "troubled" by that denial, and reversed for abuse of discretion, reasoning as follows:

> [W]e cannot agree that it was appropriate to award no fees for trial preparation time. Despite there having been a prior trial of the case, no competent attorney would embark on a retrial without some preparation. This is especially true when there has been a lengthy interval between the two trials. Here, the first trial had concluded more than two years before the second trial began. Further, the second trial was not to have precisely the same scope as the first, for at the first trial there were nine defendants, whereas at the second there was one. While this undoubtedly simplified the issues somewhat, the elimination of eight out of nine defendants could not have simplified the case proportionately, for some of the eliminated defendants were alleged to have engaged in conduct that was set in motion by Gleason [the primary defendant and key decisionmaker in an employment discrimination lawsuit by the plaintiff, Gierlinger]. In any event, the differences would doubtless have required some organizational effort with respect to the presentation of [plaintiff's] case against Gleason.
>
> We conclude that it was unquestionably reasonable for [plaintiff's attorney], after a two-year hiatus, to, *inter alia*, review the three-week transcript of the first trial, review files to refresh his recollection, organize his proposed exhibits, and prepare his witnesses. In sum, at least a significant portion of time claimed was reasonably necessary.

*Id.* at 878 (alterations added); *see also id.* at 879 ("Disallowance of reasonable trial preparation time with respect to the third trial was an abuse of discretion for reasons similar to those stated [with regard to the second trial]."). The Second Circuit thus ordered the trial court on remand to award trial preparation fees to plaintiff based on a determination of the number of hours reasonably spent by her attorney in connection with preparing for the second and third trials. *See id.* at 879.

*Gierlinger* presents some factors that appear to make it distinguishable from the instant case. *Gierlinger* involved a three-week first trial, which meant that the attorney preparing for the second trial had three weeks' worth of trial transcripts to review. Here, the first trial was only two-plus days. Relatedly, *Gierlinger* was an employment case, alleging retaliatory discrimination under Title VII, which is typically a circumstantial case. In our case, there are many fewer pertinent facts and much less witness testimony.

Yet, *Gierlinger* is squarely on point in holding that a trial court abuses its discretion in flatly and summarily denying trial preparation fees on the simplistic theory that an attorney's familiarity with the case necessarily renders all second-trial preparation work redundant and excessive. Thus, the reasoning in *Bat*—which was similarly blind since it came before any

second trial had occurred—was not merely "draconian," or a particularly harsh exercise of discretion (as Plaintiffs in our case would concede), it was unlawful—an abuse of discretion.[2]

Accordingly, since there has been no second trial in our case, Defendant should bear no evidentiary burden here, other than to show that his attorney's hours and fees to prepare for the first trial were reasonable. Furthermore, the supposed "savings" of trial preparation work that will be realized by Defendant's attorneys at a second trial are speculative. However, since Defendant did not challenge Plaintiffs' reliance on the reasoning in *Bat*, and since Defendant retained an expert to give an opinion as to what amount of first-trial-related preparation time will be permanently lost (and the amount of preparation work that will likely be useable for a second trial), this Court will defer to the parties' position that some reduction of otherwise reasonable first-trial-related preparation fees is appropriate. The Court determines based on the evidence presented that the amount of reduction should be 50%, and will thus award Defendant half of his first-trial-related preparation fees.[3]

Defendant proffered Rodney McPhee, Esq., as his expert on reasonable fees, including on the issue of the amount of attorney preparation work likely to be needed for a second trial, following a mistrial or other type of first trial. Mr. McPhee explained—in words that fairly echo the Second Circuit in *Gierlinger*—that a substantial amount of preparation work is needed for most second trials, because of the need to review transcripts, re-learn the case-specific facts and legal issues, re-prepare witnesses, and otherwise prepare for a second trial that is often not a simple or easy repeat of the initial trial.[4] The amount of re-preparation work also varies, depending in part of the complexity of the issues. Mr. McPhee testified, for example, that when he and a co-counsel had to prepare for a trial in a so-called "ancient roads" case that took place long after the first proceeding, there was a substantial burden in having to re-learn the many arcane factual issues for the later trial.

---

[2] *Gierlinger*'s reasoning finds support in decisions by other federal appellate courts. *E.g. O'Rourke v. City of Providence*, 235 F.3d 713, 737 (1st Cir. 2001); *Abner v. Kansas City S. Ry. Co.*, 541 F.3d 372 (5th Cir. 2008). And while *Gierlinger* concerned the recovery of fees by a "prevailing party" in a civil rights action pursuant to a federal fee-shifting statute (42 U.S.C. § 1988), that does not make the case distinguishable. The court's discretion or authority to award reasonable fees as compensation to the moving party is not disputed in our case, and was not an issue in *Gierlinger*, though the legal basis for the authority obviously differs.

[3] Accepting the parties' position as to the certainty of a second trial means that Defendant will have to acquire transcripts from the first trial, to properly prepare for the second trial. The cost of the transcripts was undisputed and shown to be $1250. As such, Defendants will be owed $1250 under this order, in addition to other costs.

[4] Mr. McPhee's written statement fairly represents his trial testimony, as follows:

> A substantial amount of work will be necessary for preparation for a future trial, to refresh the attorney's recollection as to facts, testimony, and legal issues, as well as to speak to witnesses. The 25% suggested by Plaintiffs is too low in my experience with trial[s] which have taken place over more than one period of time. In general, absent special considerations, it is my opinion that the re-preparation work will take about half as much time as it did as set out [in Defendant's counsel's timekeeping/billing entries].

Def.'s Ex. Q (Comments and Opinions of Rodney McPhee), at 1 ¶ 5.

Mr. McPhee's testimony also revealed that he was quite familiar with the particulars of this case. For example, he was aware of the unusual circumstance where a key witness (Mr. Conway) was unavailable for trial, and that the attorneys incurred time to prepare for and take that witness's preservation deposition.[5] This sort of attention to detail buttressed this Court's deference to his conclusions generally. Moreover, Mr. McPhee's opinions were not simply those of Attorney Robbason, or opinions most favorable to Defendant. For example, Defendant's initial legal memoranda, prepared by Attorney Robbason, sought *all* trial preparation fees, but Mr. McPhee disagreed, reasoning that only half of the first-trial-related preparation work/fees would be permanently lost and not useful for a second trial. Relatedly, Mr. McPhee agreed with the argument made by Plaintiffs that certain pre-trial work by Defendant's attorneys, in drafting proposed jury instructions and litigating motions in limine, is work that will benefit or be used at a second trial, and thus, should be disallowed. Mr. McPhee also found non-recoverable several billing entries originally claimed and submitted by Defendant's attorneys, on grounds that the descriptions of the legal work performed were not clear enough to permit a determination whether the time claimed was reasonably related to the first trial. Such reductions were not sought by Plaintiffs' counsel on that basis, and yet Defendant agreed to these reductions.

Overall, the various reductions that Mr. McPhee found were reasonable were quite significant, reducing Defendant's original claim of approximately $70,000 in attorney's fees down to $34,337.50. Defendant ultimately deferred to these conclusions and reductions. As such, Mr. McPhee did not appear to this Court to be a mere "hired gun," willing to say anything that would appease or favor his client. In the Court's view, he testified independently and fairly, based on his experience and knowledge.

The Court is unpersuaded by what Plaintiffs' counsel claimed were "soft factors" that favored a 75% reduction in trial preparation fees. For example, Plaintiffs' counsel pointed to the trial court's sanctions order issued in *Turner*. *See Turner v. Roman Catholic Diocese of Burlington, Vt.*, No. S1020-04 CnC, 2007 WL 5181441 (Vt. Super. Ct. Oct. 5, 2007). There, defendant's counsel, by his prejudicial questioning of a key plaintiff's witness, caused a mistrial of the first trial conducted in June of 2007. In October of 2007, the trial court granted plaintiff's motion for sanctions, and awarded plaintiff over $112,000 in fees, costs, and expenses. In explaining why this award was proper, the trial court reasoned that the misconduct by defendant's counsel—occurring during the plaintiff's case in chief, and prior to defendant's case—allowed defendant's counsel a "rare" opportunity to consider the strengths and weaknesses of the plaintiff's case and strategize as to how to attack that case during the second trial. Borrowing that reasoning, Plaintiffs assert here that Defendant has received a similar strategic benefit, which should weigh as a discretionary factor against the recovery of fees. The Court is not convinced.

---

[5] Regarding Mr. Conway, Plaintiffs effectively showed that for purposes of a second trial, the time to be spent by Attorney Robbason from eliciting Mr. Conway's testimony will be incurred at most once, whereas for the first trial there was time incurred both while taking Mr. Conway's preservation deposition and then while attending that portion of the trial where the video recording of that deposition was played to the jury. Accordingly, on the parties' theory of a necessary second trial, Defendant's recovery of 2.10 hours of Attorney Robbason's time on the Conway preservation deposition will not be allowed under this order. This reduces the sanction regarding fees by $735.00. *See* Def.'s Ex. Q at 4.

First, there is nothing to indicate that the Vermont Supreme Court, in affirming the sanctions order in *Turner*, adopted the trial court's reasoning regarding the defendant's strategic advantage, or found defendant's supposed advantage a basis for affirmance. Accordingly, this Court is not bound by the trial court's reasoning in *Turner* as to a supposed strategic advantage obtained through a mistrial. Moreover, the Supreme Court's opinion reveals that, notwithstanding the trial court's recognition of defendant's supposed strategic advantage due to the mistrial, the trial court's order did not rest upon a finding of bad faith conduct by defense counsel and was thus merely compensatory in nature and scope. *See* 2009 VT 101, ¶ 7 ("[The trial court] held that the award was compensatory and not punitive but noted that the mistrial had helped defendant by enabling it to see plaintiff's case and that the mistrial was a particular hardship for plaintiff. The court characterized defense counsel's actions as 'misconduct.'").

This clarification was critical, because if the defendant's counsel had been sanctioned for conduct found to have been taken in bad faith, rather than for ordinary misconduct causing a mistrial, that may have "taint[ed]" the court's determination of the amount of sanctions. *Van Epps v. Johnston*, 150 Vt. 324, 329 (1988). Further, this clarification was the basis on which the Supreme Court rejected defendant's argument that the sanctions order was akin to an exercise of contempt power, and that therefore a more rigorous appellate review of the sanctions order was required. *See Turner*, 2009 VT 101, ¶ 11. This Court does not infer from *Turner* that a tactical advantage supposedly gained as a result of a mistrial declared half-way through a multi-day trial—even if such an advantage is found—would be a permissible basis on which to adjust (either reduce or increase) a compensatory sanctions award that is only intended to make whole the party that did not cause the mistrial.

Second, assuming that a strategic advantage resulting from a mistrial is a permissible ground on which to adjust a purely compensatory sanction, the trial court's reasoning in *Turner* is not particularly persuasive here. Mr. McPhee opined that in his experience, the supposed strategic advantage gained from a partial trial that ended in a mistrial was often a mixed bag, since both parties benefit to an extent from a "test run." The Court tends to see this case in that manner. Here, by presenting nearly the Plaintiffs' entire case in chief before the mistrial was declared, Plaintiff's counsel learned (or could have learned) quite a lot about how the jury received his evidence. Additionally, and perhaps most notably, Plaintiffs' witnesses will have learned the importance of handling their reactions in the face of tense or difficult questioning. Mr. Johnson, for example, who is one of Plaintiffs' key witnesses, should benefit greatly from what he experienced and learned through cross-examination during the first trial. By contrast, Defendant's witnesses did not benefit from any such "test run". Moreover, Plaintiffs have not yet heard Mr. Sullivan's trial testimony and does not know how he will react on cross-examination before a jury. In short, the Court does not subscribe to the notion that Defendant obtained any sort of *clear* strategic advantage from the declaration of mistrial near the close of the Plaintiffs' case in chief. Certainly, there was no advantage that would warrant a reduction in the reasonable compensatory sanction.

Plaintiffs offered another discretionary factor to support a reduction of the sanctions—the theory that the mistrial was more the fault of Plaintiffs' counsel, rather than the fault of Mr. Johnson. This argument is meritless because it rests on a revised version of events. As noted

above, immediately after Attorney Robbason moved for mistrial and for sanctions, the Court heard legal argument and asked questions of counsel, before declaring its ruling. Attorney Lumpkin (Plaintiffs' counsel) explained that he and Attorney Robbason had made a pre-trial agreement that Plaintiffs' counsel would not seek to elicit testimony or otherwise present any evidence regarding Mr. Sullivan's employment with the Vermont State Police. Attorney Lumpkin further explained that while he had discussed with his clients that Mr. Sullivan's employment history was not to be mentioned and the "bounds" of their testimony, he had not recently given his clients a specific warning or instruction not to make statements about Mr. Sullivan's employment history. Attorney Lumpkin further offered an explanation for what had just happened: that Mr. Johnson became "heated" under cross-examination, and his prejudicial statement was an act of "anger" that had "slipped out."

At the January 2026 motion hearing, Attorney Lumpkin offered materially different narrative. He suggested that while he and Attorney Robbason had agreed that Plaintiffs would not introduce testimony or other evidence related to Mr. Sullivan's employment history, Attorney Lumpkin's critical mistake was his failure to inform his clients of this agreement. Attorney Lumpkin presented Mr. Johnson as a party mistakenly left in the dark about an agreement made between the attorneys. Attorney Lumpkin suggested that if blame was to be assigned for the mistake—"I will fall on my sword." That argument ignores the explanation given to the Court just after Mr. Johnson testified and just prior to the Court's declaration of mistrial—namely, that Mr. Johnson became heated while testifying, and acting on his anger, *rather than a lack of knowledge,* referenced highly prejudicial information the parties' agreed would be excluded.

Plaintiffs' counsel argued that there was no basis to find that Mr. Johnson acted in bad faith. This Court has made no such finding. Nor is the Court is required to make such a finding. Yet, to be clear, the Court is also not finding that Mr. Johnson's conduct was a mere "good faith mistake"—the clumsy inadvertence of an inexperienced lay witness. That the prejudicial statement about Mr. Sullivan "slipped out" does not directly assign bad faith. Nor does it mean that Mr. Johnson was without knowledge or that his actions fell short of *misconduct* warranting a full compensatory sanction, much as in *Turner*. Accordingly, the Court does not accept the theory Mr. Johnson's conduct was primarily the fault of his trial attorney, in supposedly failing inform him of the applicable guardrails for his testimony. The Court declines to reduce its sanction on that basis. The Court accepts that Mr. Johnson's attorney could have, but failed to, specifically caution his client immediately prior to his testimony about the inadmissibility of this highly prejudicial information. Such a warning may have changed the course of events, though perhaps not. But what actually took place was, in this Court's view, grounds for a mistrial and also sanctionable misconduct, just the same.

Lastly, Mr. McPhee was questioned as to why he believed all of the 3.70 hours of jury selection preparation time by Defendant's lead counsel was wasted or permanently lost due to the mistrial, and why none of that time or work would carry over and benefit Defendant's counsel at a second trial. Mr. McPhee acknowledged that there likely would be time savings for purposes of a second jury selection process. He also reasoned that the 3.70 hours should be fully compensable because in his experience, that amount of preparation for a jury selection was conservative, and far less than the amount of preparation time that he reasonably expected from

an experienced civil litigator for a case such as this. Mr. McPhee expects that at least 3.70 hours of jury selection preparation time will need to be incurred for purposes of a new jury selection, regardless of whatever carry-over benefits were obtained by Defendant's counsel. The Court thus finds Mr. McPhee's opinion on this issue consistent with his opinion that generally, half of all trial-related preparation work will be useable or beneficial to a second trial (with the other half lost, and in need of performance again). The Court thus finds the 3.70 hours of jury selection preparation time to be reasonably compensable and will include that time (worth $1295 in fees) in this sanctions order.

II.  Plaintiffs' Request to Deny Fees Resulting From Junior Associate's Trial Attendance

Plaintiffs dispute Defendant's claim for the recovery of fees incurred for Attorney Alvarez-Rios's attendance at trial. Attorney Robbason is a litigator and partner at large Rutland law firm. With about 25 years of experience, he handled all aspects of the two-plus days of the trial. Plaintiffs observe that Attorney Alvarez-Rios is a relatively inexperienced attorney who sat at counsel's table during the trial, but did not appear to substantively participate, such as by making any statements or arguments, handling witnesses, objecting to evidence, or otherwise.

The Court declines to adopt any sort of bright-line rule as to fees sought for a junior associate's attendance at trial. Courts generally look at several factors when deciding whether to include the fees incurred by an associate attorney who attends trial but does not actively participate at trial, or clearly plays a secondary role or function during trial. For example, if the associate's attendance at trial is entirely passive and merely serves to give the associate experience or training, the associate's time at trial is generally not recoverable. *See Mason v. Me. Dep't of Corr.*, 387 F. Supp. 2d 57, 62 (D. Me. 2005); *Morris v. Eversley*, 343 F. Supp. 2d 234, 247 (S.D.N.Y. 2004); *Oden v. Vilsack*, Civil Action No. 10-00212-KD-M, 2013 WL 4046456, at *10 (S.D. Ala. Aug. 9, 2013). However, where the associate attends trial to obtain experience and education, but also actively performs the role of "second chair," by assisting the lead counsel with note-taking, observations of witnesses and jurors, organizing exhibits, or providing legal research and legal briefing during the course of trial, some courts reduce the fee recovery by a degree, without barring recovery altogether. *See Mason*, *supra*. The overarching concern here is duplicative and unnecessary billing in situations where two attorneys are unreasonably doing the same work, rather than performing truly distinct tasks or functions. As explained by the U.S. Court of Appeals for the Eleventh Circuit:

> There is nothing inherently unreasonable about a client having multiple attorneys. For that reason, a reduction for redundant hours is warranted only if the attorneys are unreasonably doing the same work. An award for time spent by two or more attorneys is proper so long as it reflects the distinct contribution of each lawyer to the case and is the customary practice of multi-lawyer litigation. Thus, a fee applicant is entitled to recover for the hours of multiple attorneys if he satisfies his burden of showing that the time spent by those attorneys reflects the distinct contribution of each lawyer to the case and is the customary practice of multi-lawyer litigation. But the fee applicant has the burden of showing that, and where there is an objection raising the point, it is not a make-believe burden.

*ACLU of Ga. v. Barnes*, 168 F.3d 423, 432 (11th Cir. 1999) (omitting alterations, quotation marks, and internal citations).  Applying these principles, the Court will decline to reduce Attorney Alvarez-Rios' fees for her attendance at the trial.

Attorney Alvarez-Rios performed several "second chair" functions during trial.  She was requested to be there by Defendant's lead counsel, Attorney Robbason. While he alone handled questioning the witnesses, making legal arguments and objections, Attorney Alvarez-Rios was present as a "second set of eyes and ears." Her role was to observe the witnesses' performance, the jurors' reactions or behavior, and perhaps other facets of trial that Attorney Robbason—as lead counsel preoccupied with his primary functions—might overlook or forget.  Attorney Alvarez-Rios credibly testified that she performed that role. The Court also understands that a second chair is often useful to facilitate good communication with a client during trial (including while witnesses are testifying).  The Court observed that Ms. Alvarez-Rios was frequently communicating with Mr. Sullivan throughout the trial, and that was not a function that Attorney Robbason could have performed, at least not while he was questioning witnesses.

Defendant's expert, Mr. McPhee, testified that he often recommends to his clients that a second chair be permitted to assist a lead counsel at trial. He believes there is generally a strong value or benefit to the client from a second chair, even if the second chair does not handle a witness or otherwise directly participate in the proceedings.  For example, sometimes the second chair attends trial so that the second chair can handle any legal research or legal briefing needs that may arise during a multi-day trial.

Indeed, while Attorney Alvarez-Rios did not perform any legal research or legal briefing during the course of trial, the record shows that she was well-positioned due to her pre-trial involvement, to perform those tasks during the course of the trial if needed.  Before the trial began she drafted proposed jury instructions, and drafted opposition filings to multiple motions in limine filed by Plaintiffs.  Those motions were largely denied but were likely to be raised again during the trial. It is unreasonable to think that any attorney could be called in to perform cogent and competent legal research, briefing, or advice to co-counsel, without having observed the trial, In short, her attendance at trial was reasonably necessary.

For these reasons, the Court finds that Attorney Alvarez-Rios' time spent attending the trial was reasonable and was distinct from the work done by lead counsel, thus, the Court declines to reduce her trial-attendance fees for purposes of this order.

## III. Calculations

Plaintiffs will be ordered to pay Defendant the following as a sanction:

a.  $2,123.81 in "hard costs"
b.  $1,250.00 for trial transcripts
c.  $34,337.50 in fees (Def.'s Ex. Q at 5), less $735.00 re: Conway deposition = 33,602.50

**Total = $36,976.31**

IV. <u>Plaintiffs' Request to Defer Enforcement of Sanctions</u>

Lastly, the Court declines Plaintiffs' request to stay enforcing this order until all the claims in this case have been finally resolved on the merits, including by exhaustion of all appeals.

Plaintiffs argued in their initial legal memoranda that unless such a stay of enforcement is granted, Plaintiffs will be compelled to seek interlocutory review; however, interlocutory appeals are generally disfavored as a matter of judicial policy. In other words, to avoid traversing that policy, the Court should take no action that would essentially force Plaintiffs to take an interlocutory appeal.

An appeal of an interlocutory sanctions order is not as of right, *see* V.R.A.P. 5(b); *Cote v. White*, 127 Vt. 210 (1968) (per curiam), and yet Plaintiffs' argument clearly rests on a presumption that an interlocutory appeal will be allowed. Moreover, Plaintiffs' argument is circular, to wit: deferred enforcement of the sanctions order should be granted, because without it, an interlocutory appeal will result and therefore contravene accepted judicial policy. This logic fails because that very policy disfavors the granting of *any* interlocutory appeal.

Perhaps unsurprisingly, Plaintiffs' legal argument during the subsequent motion hearing abandoned (or put aside, at least) the notion that an interlocutory appeal is a viable legal option. Plaintiffs' counsel argued that if this sanctions order is made enforceable before the case is decided on the merits, that would leave Plaintiffs in a "procedural 'No Man's Land,'" where their appeal rights will be effectively deprived or somehow lost. This argument disavows that V.R.A.P. 5(b) was, in fact, a viable procedural option available to them.

Indeed, Plaintiffs argued during the motions hearing that the way out of the "procedural no man's land"—aside from a stay of enforcement of this order until the merits are resolved completely—is for the Court to direct entry of final judgment on the issue of sanctions, pursuant to Rule 54(b). Significantly, the entry of a Rule 54(b) final judgment would give Plaintiffs an automatic right to appeal a "sanctions judgment." Plaintiffs could also then move under Rule 62(g) for a stay of enforcement of that judgment, until the whole case ended by a final judgment, and thereby have their appeal of the sanctions judgment heard together with other appealable issues.

Plaintiffs' reliance on Rule 54(b) is mistaken. Rule 54(b) is not a viable procedural alternative here because sanctions orders against litigants do not qualify as "claims for relief" under Rule 54(b). "When more than one claim for relief is presented in an action," Rule 54(b) permits the court to "direct entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." V.R.C.P. 54(b). That Rule "refers only to claims [for relief] in the sense of the substantive right being asserted—the cause of action." 10 M.K. Kane & A.N. Steinman, *Federal Practice & Procedure (Wright & Miller)* § 2658.4 (4th ed., Sept. 2025 update). The substantive causes of action here are for breach of contract and for breach of the covenant of good faith and fair dealing. This sanctions order (and the declaration of mistrial) are not causes of action or "claims for relief" within the meaning of Rule 54(b).

After all, the basis for this order is the course of the litigation itself, rather than any transaction or occurrence from which the parties' claims for breach of contract and bad faith arose. *See Swanson v. Am. Consumer Indus., Inc.*, 517 F.2d 555, 560-61 (7th Cir. 1975).

Further, matter of practical logic, it seems unlikely that Rule 54(b) would be a procedural alternative to V.R.A.P. 5(b)—*i.e.*, freely available to a party that (as Plaintiffs earlier argued) also has a right to seek an interlocutory appeal under V.R.A.P. 5(b). Permission to pursue an interlocutory appeal is discretionary, with certain requirements and policies that the trial court must determine are satisfied and/or outweighed (including, as Plaintiffs noted, the policy disfavoring piecemeal appeals and delays). By contrast, the litigant who obtains an adverse Rule 54(b) final judgment may appeal as of right. Thus, if Rule 54(b) and the right to an immediate appeal was so readily available as an alternative to litigants, it would render V.R.A.P. 5(b) and the notion of interlocutory appeals a useless or disfavored procedural mechanism. Further, permitting an immediate appeal from a sanctions order could risk forestalling resolution of the case, as each new sanction would give rise to a new appeal. *Cf. Cunningham v. Hamilton Cnty., Ohio*, 527 U.S. 198, 208-09 (1999).

*Turner* is not to the contrary, despite Plaintiffs' view that the trial court there issued a Rule 54(b) final judgment as to sanctions. For example, the trial court's sanctions order from October 5, 2007, included no "express determination" that there was "no just reason for delay," an essential requirement under Rule 54(b). *See* 2007 WL 5181441. Similarly, the court did not "express[ly] direct[]" the clerk to enter a final judgment. V.R.C.P. 54(b). The record also shows that trial court issued a "Final Judgment" in January of 2008, a month after the verdict was issued following the second trial, and that Final Judgment specified that the October 2007 sanctions "decision" (not judgment) was being "adjudged" in that Final Judgment. *See* 2008 WL 2078995. Moreover, the Supreme Court's decision in *Turner* refers only to an appeal from a final judgment, not consolidated appeals from both a Rule 54(b) final judgment and a final judgment for the remainder of the case. In any event, for reasons noted above, this Court cannot see how the October 2007 sanctions decision by the trial court could have constituted a "claim for relief" under Rule 54(b).

As for Plaintiffs' request to defer enforcement of this sanctions order, the Court does not find that a reasonable or just request. As noted during the motion hearing, Defendant incurred thousands of dollars of costs and expenses, related to the costs of litigating the first trial. His legal bills and other financial obligations certainly do not become stayed during this entire litigation. The Court does not see why Defendant should continue to carry first-trial-related costs and expenses until after a final judgment. Indeed, a stay of enforcement of this order, throughout the full pendency of this case, would have Defendant bearing the risk of Plaintiffs' potential insolvency and non-payment. *Cf.* V.R.C.P. 62(g) (implicitly recognizing that a stay of a Rule 54(b) judgment until a final judgment is entered as to the whole case may present a risk of non-payment to the party that would benefit under the Rule 54(b) judgment; courts "may prescribe such conditions [in the stay order] as are necessary to secure the benefit thereof to the party in whose favor the judgment is entered").

While Plaintiffs are unquestionably the party at fault for the mistrial and bear the responsibility for the wasted costs and fees incurred by Defendant. Further, Plaintiffs have

suggested that they will likely fall into contempt by immediate enforcement of this sanctions order, but Plaintiffs have not actually argued, much less proven, irreparable hardship. They have not shown that their ability to litigate this case fairly and fully will be substantially hampered, or that they will be otherwise irreparably harmed by immediate enforcement of the order.

Additionally, Plaintiffs have not provided authorities where enforcement of a compensatory, monetary sanction for litigation misconduct was stayed until all the claims in the case were resolved on the merits. Many decisions point in the other direction. *See Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, No. 17-5009 (JRT/KMM), 2020 WL 6264467, at \*2 (D. Minn. Oct. 23, 2020) (monetary sanction for discovery violation "is immediately enforceable, even though it is not a final decision under Rule 54(b)"); *Bat*, *supra*, at \*4 & 4 n.9 (rejecting, as "wholly without support," the request by plaintiff's attorney "that the execution of the sanction be stayed pending final resolution of this case on the merits"); *Blemaster v. Sabo*, No. 2:16-cv-04557 JWS, 2018 WL 10322071, at \*2 (D. Ariz. Mar. 1, 2018) (sanction for discovery abuse "cannot be ignored until the final judgment is entered" unless "hardship is present"). This Court concludes that as a matter of fairness, and to further the administration of justice, the sanction should be enforceable within 30 days.

Therefore, the Court will deny Plaintiffs request to defer the deadline by which to make payment of the amount due to Defendant pursuant to this order. The payment will be due within 30 days of this order.

## ORDER

Defendant's oral motion for sanctions made in court on November 19, 2025, is hereby GRANTED IN PART, and DENIED IN PART. Plaintiffs are ordered to pay $36,976.31 to Defendant as a compensatory sanction for Plaintiffs' conduct that resulted in the mistrial.

The Court further orders that the amount will be due and payable by Plaintiffs, and enforceable by Defendant, 30 calendar days from the date that this order is filed in the case docket.

Electronically Signed on: Monday, March 16, 2026 pursuant to V.R.E.F. 9(d).

_____
Susan A. McManus
Superior Court Judge